Webb. Thank you, Your Honor. May it please the court. Mr. Dilworth is entitled to trial on his two procedural due process claims and on his excessive force claim in this case. With respect to his procedural due process claims, Mr. Dilworth has demonstrated and the defendants do not contest that while still a pretrial detainee, he was punished with solitary confinement, without notice of the charges against him, without a hearing, without the ability to call witnesses. Can I ask you a question? If the record shows that clearly, what is it you want a trial on? What fact issue do you think needs to be resolved on the due process side? What fact issues remain for a jury or a fact finder? Well, Your Honor, in our briefs we asked for a trial on that issue, but if the... I'm curious as to what it is you would like a fact finder to determine. If this court believes the facts are sufficiently clear that he was denied these due process rights. I'm asking you, I mean, is there a factual, do you have in mind a factual dispute that would go to a jury? On the due process question. Like, is there a factual dispute, for instance, as to whether or not he got a hearing? Well, no, Your Honor. We believe that the Wolfe procedures, there's really no factual issue that those were denied here. There could be a factual issue on the punishment issue, but we believe the facts are clear there. It's certainly enough for a trial and potentially for a judgment from the court. Is this a triable issue here again? With respect to the procedural due process claims? Yeah. Well... Whether it's constituted punishment or not. Correct. Is that what you're just saying? Correct. You're saying it's clear that, and you would be entitled to judgment right now, that the Wolfe standard applies. Correct. And, Your Honor, we would also urge that it's clear that he was punished here, given that the defendants don't seem to contest that fact and that the terms on which the sentence was imposed here speak in terms of punishment, of a penalty of discipline. So, we do believe that the district court could just enter judgment on that issue here. You were just being conservative when you said you wanted a trial. Correct. And then perhaps there would be a trial issue on the damages. We also believe that Mr. Dilworth is entitled to a trial on his excessive force claim. The district court here applied the wrong legal standard, which was subsequently overturned by the Supreme Court in Kingsley. And the district court also made unsupported findings of fact on the record and drew improper inferences, resolved factual disputes against Mr. Dilworth. Can we go back to the due process claim? I mean, I have read Wolfe and I think that you've fairly characterized it, but what exactly is a prison supposed to do? Under Wolfe, if a pretrial detainee is to be punished, which is what we have here, the Supreme Court and Dilworth were clear that the prison must provide 24 hours notice of the claimed violation of the prison rules. Okay, so what happens during that time? During the 24 hours, the defendant, the inmate here, the pretrial detainee, has a chance to prepare some sort of defense. I know he has a chance to prepare, but where is he in the prison? Well, there is a few options. Courts have recognized that temporarily, a detainee can be placed in some sort of restrictive environment, but that before he's sentenced, excuse me, charged and sentenced, he has to have the Wolfe procedures provided to him. You're not saying all these procedures need to be provided pre-deprivation or pre-putting him into some sort of administrative segregation? No. Your Honor, we, detainees... As a temporary measure, the prison can put the pretrial detainee in some sort of administrative segregation to settle the situation down, and then at some later point in time, preferably sooner rather than later, you have 24 hours and proceed then. I just want to make sure you're not saying that all this is, all these Wolfe procedures are not pre-deprivation or that the prison is disabled from putting him in administrative segregation as a temporary expedient? No, that's absolutely correct. Something to defuse the situation, and that may involve just separating people. Correct, Your Honor, absolutely. The Wolfe procedures are simply required before the inmate is charged and sentenced, and emergency measures can be put in place before that. And there's really no dispute that that was not this case. Here, Mr. Dilworth was charged and sentenced within an hour of the infraction and put into 45 days of solitary confinement without the Wolfe procedures. So we think this is a clear violation of Bell and Wolfe. So how long was he kept in, you know, I guess I'm naive, I think of pretrial detention not lasting months and months and months. It lasted a few months here, I believe, maybe. Weren't there two different 45 days? There were, Your Honor. Yes, so he was in solitary confinement. There was some time in between them where he's still in pretrial detention, right? Correct. So he was in solitary confinement for most of his pretrial phase here, and I would just note that that made it particularly difficult for him to prepare for his hearing because in solitary confinement you can receive in-person He is not, Your Honor. He has been released as of earlier this year. Was he convicted of the crimes for which he was in pretrial detention? He was. His crime here was failure to appear. His crime was failure to appear? That's my understanding from the record, Your Honor. And so now he's got at least 90 days in solitary confinement before he's ever come to trial on that? Correct. And with respect to his excessive force claim, you know, again, we would argue here that it's very clear that the district court applied the wrong legal standard, and even if Your Honors were to conclude that the standards somehow are similar enough or that the district court addressed the new standard sufficiently, which we would urge you not to find, the district court, in addressing that standard, made unsupported factual findings. If you'd been provided the due process hearing, what evidence would you have put on? What evidence would Mr. Dilworth put on to the was attacked from behind, unprovoked by another inmate, and he's explained that at the time the guard on duty was on another level, so he was vulnerable to attack. In fact, the reviewing officer, Lt. Fales, agreed that Mr. Dilworth did not make the first aggressive move in the fight. Did he indicate that in any communications with the prison supervisors or the board that he was going to hear his case? Mr. Dilworth did, and Lt. Fales did as well. In Lt. Fales' report that he issued as the appeal officer in the case, he made that finding. Did he want a chance to bring the other inmate before the board? He did. He wanted a hearing. He wanted a chance to make his case. Did he want to bring the other inmate before the board? Yes, I believe he did, and perhaps other witnesses. Did he request that? I believe that he requested all of these things in his various grievances, Your Honor, but he certainly requested a hearing, and at the hearing he would have wanted to call witnesses. Was it just generally, because that could be just a boilerplate kind of a request? I'm wondering if he got more specific with the request and said, you know, there's an inmate who hit me from behind. You know, I would like to call if somebody else observed. I would like to call. In other words, I'm anxious for these due process claims not to just go forward into hearing after hearing after hearing on some kind of generic boilerplate, but have the inmate say, this is what I hope to prove. This is who I'd like to bring. Give the prison facility some idea of the purpose, rather than just, oh, I'd like to do that, because that's sort of a fishing expedition. That can turn the place inside out. So I'm wondering how specific he got with the request, because if it's not specific, you run up against the question of whether that can be denied, which has never been requested. In other words, can due process be denied if something hasn't been requested? And so I'm asking you, how specific were those requests? Because as I say, you can tie the prison into knots by just some form that's submitted as part of a grievance. Sure. So Mr. Duluth was very specific in his grievances that he filed about the other inmate attacking him and about wanting a hearing. I don't know if he used the language that we would recognize for a hearing and all of the rights attendant. Read that portion of the record to me, where he is requesting. Sure. So Your Honor, he filed multiple grievances about this. I'll have to find. If Your Honor wouldn't mind, I might look and read it on rebuttal, so as to not waste the court's time. Thank you. Can I ask you a question about the, I guess about your reading of Wolfe? I mean, is it your understanding coming out of Wolfe that inmates are entitled to a hearing, pretrial detainees are entitled to a hearing before punishment if they make a sufficiently specific request and if it seems to the prison officials that there's a good reason to have a hearing? No, Your Honor. We would argue that Wolfe simply sets those as baseline requirements. And I appreciate Judge Wilkinson's concern that a prison might just have to provide hearings, provide very detailed opportunities to inmates. Here, we think that Mr. Dilworth was very specific in the issues with confining him in solitary segregation. It wasn't a case where he just objected generally to some sort of measure taken against him. And I will take a look at the record and see what he said. I'm not sure I understand your answer because you're sort of, I think, trying to be all things to all people. Always difficult. But I thought that when you first responded to my colleague, you said, no, we don't think he had to make any particularized showing. He was entitled to a hearing promptly. Correct. No matter what he said. Correct. Before they punished him, since he was a pretrial detainee. Just like you're entitled to your Miranda warnings and you don't have to say, well, no, I need some Miranda warnings here. No, you get them, right? Correct. And you've got this. You say that. That's your number one argument. And your number two argument is, if you did need this particularized showing that you should get a hearing, he made it because he filed these various grievances. Correct. Now, what I guess my other question to you is you're absolutely right. He did file a million grievances. I wasn't sure exactly when they were filed. And it would be natural, it seemed for me, for him to file the grievances after he hadn't gotten the hearing. Right? I mean, it's not going to be the first thing off his mind to file 14 grievances. Correct. Correct. And after he was, in fact, not given a hearing. And then 11 days later, almost two weeks in the second incident, provided with an appeal. And Your Honor, I would just slightly recharacterize what you said. Our argument is that Wolf requires these baseline procedures, period. And the second point I would just make is that, you know, here there's an even more compelling case because Mr. Dilworth was very specific about the problems with his confinement. Just to address Judge Wilkinson's concern. I think your case gets stronger if the specifics of the request are made. I mean, it's just, it just seems to me a stronger case. Correct. And the prison does have some discretion in how it allows witnesses to be called and things like that. And I think that Mr. Dilworth's specificity would come into play there, perhaps. Good morning. May it please the Court, my name is Scott Hart. I represent the appellees in this case. Let me start out by addressing a few of the points that were made by counsel for Mr. Dilworth. Up front was an assertion that Mr. Dilworth was held in solitary confinement. There are a number of detainees, both punished detainees, convicted persons, and pre-trial detainees, and the issue of solitary confinement. The segregation that Mr. Dilworth was subjected to in this case really meant that he couldn't leave his cell. He was still in the same cell block. He simply couldn't walk out of his cell and spend the day at the tables in the day room. Did he get a hearing before this confinement? No, ma'am. No hearing. So I thought that there was sort of a fundamental misunderstanding in your papers about what Supreme Court law required here, what standard applied. The standard is different for pre-trial detainees than for detainees in general. That's correct. And, Bill— I hadn't realized that you recognized that in your papers, but you recognize it now. Yes, ma'am. And I apologize if the brief was misleading on that point. Bill requires that if a pre-trial detainee is punished, that there be some due process. But Bill also makes a very important statement that there is, in certain circumstances, an imposition that could be de minimis and that would not require the Constitution to be involved. And that comment in Bill is then echoed in a number of other cases, and we think applies to cases like Mr. Dilworth's. As an example, one of the impositions on Mr. Dilworth was that he was unable to purchase snacks from the jail canteen. This was something that he complained about in a number of his grievances. He wasn't in solitary confinement? He was not in solitary confinement. Well, and, Your Honor, to be fair, there are cases, for example, cases where in the Supernant case v. Rivas, which is a First Circuit case, they refer to the plaintiff being thrown in the segregation wing, which is otherwise known as the court says the hole. In the Higgs v. Carver case, the Seventh Circuit case, the court specifically made a finding that the inmate was held in a form of solitary confinement. As the affidavits that were filed in support of the motion for summary judgment set out in this case, administrative segregation at the New Hanover County Jail means that inmates are not free to leave their cells during the course of the day other than for one hour. They aren't moved into a different wing. Well, that doesn't make any difference. That's still solitary confinement. Well, and it may or may not be, and here's where I may differ with you. Inmates are able in certain jail configurations to be able to walk up to the cell doors of other inmates, but those inmates are not permitted to be outside of their cells in the day room. And you think that's de minimis, that you're confined to your cell for 45 days, that that's what Bell had in mind as a de minimis? I mean, not being able to buy snacks, maybe, but confined to your cell for 45 days seems different. And there have not been any findings specifically in any cases that held that. For example, in the Hamilton v. Lyons case, which is a Fifth Circuit case from 1996, the plaintiff in that case claimed that the jailer's denied him privileges, denied him visitation, phone access, recreation, mail, legal materials, sheets, and showers. And the Fifth Circuit found that to essentially be de minimis. And so in a case like this, where the inmate is then restricted to his cell for 23 of the 24 hours and has these other impositions imposed on him, it's our position that there are conditions, given the configuration of the jail, potentially where a court could find that that is de minimis under Bell. But none of this was argued below. No one has made that finding, right? The district court in its order found, in the order granting summary judgment, that the impositions on Mr. Dilworth did not rise to the level of a constitutional deprivation. And so that was the essential finding of Judge Dever in the lower courts. The district court assumed that Wolfe applies, right? That Bell and Wolfe apply? I beg your pardon? I'm sorry. I thought the district court assumed slash held that this person was entitled to the Wolfe procedures and that Wolfe had been complied with here, because I don't really understand why, but that Wolfe had been complied with. The district court did not say this is de minimis under Bell, and so no procedures were required. No, ma'am. The district court didn't make that specific finding. But by the same token, I don't believe that Judge Dever, in his order, addressed and said specifically that these findings or that the post-deprivation remedy and the grievance process that Mr. Dilworth went through were insufficient under Wolfe either. He made the finding that while Mr. Dilworth might wish for a different due process, that he has not shown that the process he was given was insufficient. And as this court held in the Slade v. Hampton Roads Regional Jail case, when due process is required, it's a flexible standard that courts have to look at in determining what that due process is. But good news, the Wolfe Supreme Court already did that for us in Wolfe, right? The Supreme Court did say make those findings in Wolfe, but Wolfe is also very different in terms of what sort of deprivation it includes. In Wolfe, for example, it's clear that there's a liberty interest at stake, because in Wolfe, good time credit was being taken away from the inmate, essentially lengthening his sentence. Do you think that was crucial to the holding in Wolfe? I've never heard anyone else ever say that. I'm not certain that it was crucial to the holding, and I'm glad to have come up with a novel way of thinking about it. But I think that there is an important distinction. If it's novel, then maybe it's not accurate, since Wolfe, like, wasn't decided yesterday, right? No, ma'am. 1974. Yes. I think that the importance of the distinction with Wolfe and Bell is that Bell talks about the determination of what is de minimis. And there aren't any bright-line rules that any of the courts have written down that say, this is de minimis. If you put someone in administrative segregation where he is, where he loses the ability to purchase snacks, but he gets his meals in his cell, he just can't go to the day room, he has the ability to have visitation with counsel and with clergy, but not with other individuals, that that then goes over the line from de minimis. And if it is not de minimis, if, in fact, it is required that there be due process, under the holding of this court in Slade, do we go all the way to what Wolfe requires of a full-blown hearing within 24 hours before any imposition can be placed on the inmate of these natures? So, for example, the question that is raised is, if in this case, Mr. Dilworth was allowed out of his cell for four hours a day instead of for one hour a day, would that have been de minimis under these circumstances? Whereas in this case, he was limited to his cell for those 23 hours. The problem is the limitation on the local jail officials to be able to deal with situations such as Mr. Dilworth's, where he was involved in an altercation with another inmate and then with an altercation with two of the officers. This isn't in your brief, right? I mean, I'm feeling foolish. But I'm hearing all this for the first time. We, Your Honor, we did not raise the de minimis argument specifically in the brief. What we argued in the brief, I believe exactly, was that the punishments imposed on Mr. Dilworth, the consequences imposed on Mr. Dilworth, were not sufficient to raise the need for constitutional due process. Under Sandin, which you now concede does not apply to this case. And while the other circuits have held, yes, that Sandin applies to convicted persons and not to pretrial detainees, the logic that's inherent in Sandin falls right in the line with, for example, the language used by this court in the Predo case last year, that an inmate can only be deprived of that to which he's entitled. Okay, but just to go back to my colleague's question, do you or do you not concede that Sandin does not control here? I agree that all of the circuits that have considered it have determined that Sandin controls. You would like us to say it does control, is that it? It would certainly not be something I would argue with if you did. Well, it's something that in your brief you urged us to do, right? Yes, ma'am, that's correct. It's often good to argue the same thing, you know? I mean, we have all these cases. We try to get down what you say in your brief, then you come up and... And the ultimate... It's you, your brief. The ultimate position taken in the brief is the same one that we take today, which is that the punishment... That you should win. We understand that. Yes, ma'am. And that the reason that we should win is because the punishment that was imposed here does not rise to the level of requiring due process and to the degree that it did that the due process that was given was sufficient. Can I ask you a question? Just sort of help me out here. Just assuming for a minute, hypothetically, that Sandin does not control in these circumstances and that your de minimis argument does not prevail, either because it was waived or because it's no good on the merits, then can you tell me why you win your due process claim? In other words, if due process was required, then the question becomes whether the due process, whether the post-deprivation grievance appeal process through the New Hanover County Jail was sufficient. Under Wolf. Under Wolf. And then as this court talked about in the Slade case... Maybe start with under Wolf, because that is sort of pretty authoritative Supreme Court guidance as to what this procedure should look like. Wolf does outline certain procedures, and if the Wolf-specific procedures are required, then they were not met in this case. Okay. And I will answer the question that was raised earlier by opposing counsel or towards opposing counsel. Mr. Dilworth, in one of his many, many grievances, did specifically ask for a hearing in which he could call witnesses. Ask for what? Ask for a hearing in which he could call witnesses. One of the many grievances that are in the appendix does include a request for a specific appeal where he could call witnesses. He filed multiple grievances, on some occasions, multiple times a day, but in at least one of those, he did specifically request a hearing. If he had only filed one grievance, you'd say he really wasn't bothered. There's no question that he availed himself of the grievance process. And he was bothered. Yes. Right. Yes, he objected. He did. He did. And the issue then, if you have any other questions about the procedural due process, I'm happy to address them. I think that the Kingsley issue is fairly straightforward in terms of the standard that was applied, and we've addressed that in the brief, whether under the new standard, whether the officers Cookson and Trott would be entitled to summary judgment. And yes, there are issues that there are distinctions between what Mr. Dilworth says about what happened in those interactions and what the officers say happened in the particular interaction on July 5th. But whether it rises to the level of being able to get past summary judgment, we believe that looking at the interactions, looking at the affidavits that were filed, including Mr. Dilworth's affidavit, that there is still sufficient information that's presented to the court for the district court to have made the finding. So what in your view, let's say the issue went to trial, what in your view would be the triable issues? On the excessive force or on the due process? On the due process, fine. If the finding of this court is that not only were the impositions on Mr. Dilworth more than de minimis, i.e. that due process was required, but that the specific due process that was required. There would be a question as to whether it was punishment? Well, there could be a potential legal, a potential finding about whether or not these particular consequences rose to the level of punishment under Bell. Would that be a question for the jury or a question of law? I believe that it's a question of law, given the facts as to whether or not this was punishment. But the jury would have to make the determination about whether or not, or specifically... Let's say it's in a gray zone. And is it a question that should be resolved as a matter of law or would you submit it to the jury? I think that if it's a gray zone, it will be submitted to the jury on the issue of whether or not the intent was to punish. That's the thing that Bell talks about is the first part of its two-part standard, is there is an intent to punish. Is the intent to punish or the effect of the impositions being tantamount to punish? Well, and as Justice Scalia mentioned in his dissent in Kingsley talking about Bell, you know, Bell in many ways is a conditions of confinement case. And if you were talking about something less than the intent to punish... Is punishment here a matter of intent or effect? I think punishment here is a matter of effect, because there has to be some ability, some flexibility given to local jail officials to be able to take actions relative to inmates that impose on their privileges, but that don't rise to the level of punishment that is protected by the Due Process Clause of the Constitution. And there has to be some flexibility for them to have privileges that are given to inmates, such as the provision of the canteen to purchase snacks or the ability to sit in the day room and watch television that don't give rise to constitutional protections that can be taken away. But apart from the de minimis thing, to the extent that your brief read Bell as sort of saying, if the intent is to punish, that triggers the punishment due process. You're not arguing here that the intent was not to punish, are you? I mean, your brief says that he got a penalty for a disciplinary violation, 45 days in segregation. I mean, that under straight bail terms, that's enough to trigger the due process. And that's what the brief attempts to raise, which is the issue that when there is a taking away of some privilege that has been given to a pretrial detainee, does it rise to the level of punishment? Where does the brief attempt to raise that? Okay. The middle of page nine. Accordingly, the disciplinary actions taken against plaintiff did not rise to the level necessary to implicate a liberty interest. And hence, no due process was required. That's your Sandan argument. Yes. Okay. But that's not the question anymore, right? And again, the logic behind Sandan is that there is some level at which there is a ---- For convicted prisoners. Yes, ma'am. Yes, ma'am. That is correct. I'm totally with you as far as convicted prisoners go. And the importance of Sandan is that it requires, as part of the logic underlying its holding, that there is a certain level of ---- Now I understand. So you really are arguing we should adopt Sandan, we should apply the logic of Sandan, if not the holding, to pretrial detainees. That's correct. Gotcha. Okay. That's correct. You know, my concern about this case is I think he should have been given a hearing here, but these things, they can turn the jail environment inside out. And so what are the, in your views, your view, what are the discretionary prerogatives that jail officials must enjoy to make a jail run properly? In other words, you can't, I don't think you can put jail superintendents in a straight jacket here. And, you know, there's a danger with Wolf v. McDonnell, and that is it can fall over either side of the line. On the one hand, you can deprive inmates of a chance to make their case, and not inmates, but detainees, of a chance to make their case and put that forward. That's clearly one side of the equation. But on the other hand, you can fall off the other side of the fence and make a jail absolutely unmanageable. So I'm asking you what areas of discretion, in your view, are crucial to making the jail manageable and not having detainees call the tune and sort of turning things inside out? Where are the areas of discretion that ought to belong? Just tick them off. Where are the areas of discretion that ought to belong to jail officials? By way of shorthand, those areas should be ways in which the jail has decided, through its management, through the decision of its policies and procedures, to provide certain privileges to inmates that go beyond the minimum rights that they are entitled to. So deprivation of privileges, in your view, does not, as a matter of law, arise to punishment? Yes, sir. That's correct. That's what? That would be the best way. That would be one area of discretion. Another area of discretion is that these Wolf hearings don't need to be held pre-deprivation, that there's options of administrative segregation and separation that exist, and then you can get to the hearing afterwards. Another area of discretion is that the jail officials, at the time of a hearing, would enjoy quite a bit of latitude, like any trial trier of fact would have, over what evidence is relevant or irrelevant or what evidence is cumulative. In other words, there are all these different areas of discretion that are absolutely crucial if Wolf isn't going to turn the environment inside out. That's basically one of the things you're hoping to achieve with this argument, which is that maybe necessarily I don't win, but as a bottom line, do recognize the discretion that jail officials have and the responsibility they have in managing the place and how they can carry it out without having it become semi-anarchic. If jail officials were required prior to the removal of any privilege as a result of a rule violation by a pretrial detainee to have a full-blown hearing with witnesses present, it would be necessary to have hearing officers... I'm not asking for a pre-deprivation hearing here. There's got to be some sort of emergency authority on the part of a jail official to just say, look, I want things to quiet down. Everything is way too heated. We need to separate you. We need to move you from yourself. It's a cooling-off period. They have to have that, and then they can find out what happened later. But you make a great point, which is the importance of the ability, and the Supreme Court makes this point, in fact, in Bell. The importance of giving wide-ranging deference to jail officials to have the policies and practices in place that are necessary for a safe and secure management of the jail environment itself. And so that is, I think, the overriding...  easy to fall off the cliff in either direction. I mean, if there ever was something that required a sense of balance and measured approach, it strikes me that this is it. Two very important interests involved, and it's important not to let one run rush shot over the other. Yes, sir, I agree. I see my time is up, unless there's a particular... I have a question about excessive force. I just wanted to ask one or two quick questions on excessive force. One is, is there a reason not to make the videotape of the incident part of the record? I mean, doesn't it seem like, to the extent that there are at least arguably some... We've got this for so long, I can't remember who said this, but I think it was you, that there were at least some discrepancies in the description of the incident. Yes. Is there a reason not to look at the videotape? There were two incidents that were referenced in the complaint. There was the May incident in which Mr. Dilworth was involved in an altercation with another inmate. I'm talking about the one that gave rise to the excessive force. Right. There was a video of that. The second incident between the Cookson and Trott, there was not a video that showed that specific interaction. And Mr. Lieutenant Fales, who was the administrative review officer, did not have one available to him. So the videotape is not the excessive force. Well, that takes care of that question. Are officers Cookson and Trott, are they in the same position with respect to this qualified immunity analysis in your mind? Do they stand or fall together, or are they differently situated in the way should we think about them differently for purposes of summary judgment on qualified immunity? I'm not sure I understand the question. They were both involved in the altercation. They were. It did strike me that there were fewer discrepancies in the description of what happened with respect to Officer Trott than there were with respect to Officer Cookson. Yes, ma'am. That's correct. OK. That's correct. Can I ask you one question, too? Yes, ma'am. Can you turn to JA 106 and 107? Those are labeled the new Hanover County Detention Facility inmate disciplinary procedures. Yes. Were those procedures followed here? We believe that they were with regard to the... It characterizes what happened here as a formal disciplinary action, right? Are you talking about JA 106? Yeah. Yes. So this would qualify as a formal disciplinary action because it's more than two hours, right? Yes. OK. And then read under what the inmate rights are under section three. Yes. Inmates require... He's entitled to a hearing, isn't he? He has a right to make a statement. He has a right to ask questions of his accuser. Yes. Did any of those things happen? No, ma'am. OK. It sounds like the prison has in place a procedure that it thinks it can abide by that is in compliance with Wolf and it did not abide by. So it alleviates Judge Wilkinson's worry that the prison is going to be put at six and sevens because it's the very own procedure would give him basically a good deal more rights than he had here. Right? I mean, you can't change your client. That's one thing I learned as a lawyer. The procedure gives him more than he received. That's correct. Right. OK. Whether or not that creates a constitutional obligation or not is a different question. But it does indicate to us what the prison believes it can do and should do in this situation. Certainly one reading of it. Yes, ma'am. Well, what other reading is there? Well, when it comes to the practices and policies that are adopted by jails many times, they are trying to determine the best way that they can handle it. But in many instances, the determination of how those are actually carried out can be different. So in other words... So this is the best way. This is the prison's view of the best way it can handle this in a way that it's set forth and told its people it should handle it. Presumably so. I don't know what I can... Otherwise, they put in writing things... I can't attest to what went into the determination. ...involved in the application depending on how serious the incident is and the rest. And so you may be... A serious incident may warrant a longer cooling off period than a trivial one or what have you. That's correct. It covers trivial incidents. Or a different departure from the disciplinary process. This one wasn't a trivial. All right. Thank you. Thank you. Ms. Webb, you have some rebuttals here. Thank you. And first, just a quick clarification point. Judge Harris, you asked about the video. My understanding is there is a video of both incidents. And in his affidavit, Lieutenant Fales describes watching a video of both incidents. So that's just a quick... Is the video of the first incident or the second? There are two videos of both incidents. Videos of both incidents? Correct. And we don't know what those show other than Lieutenant Fales' descriptions of them because obviously they're not in the record yet. Would the videos be something for the district court to look at on the summary judgment record? We believe that the district court... Or it wouldn't necessarily need to go to trial. It might. We believe that... Wouldn't the district judge first have an opportunity to review the video on the summary judgment record? Well, Your Honor, we think the district court should have reviewed the video. And the defendant should have placed it into the record. But we think that even without the videos, the facts are very clear in both incidents that Mr. Dulworth is entitled to either judgment or a trial. But should there be a trial, we think the video should be made part of the record. I do want to be clear on this. If there is a video of the second incident, the one giving rise to the excessive force claim, is it your position that should this case be remanded to the district court, the district court judge ought to watch that video before deciding whether qualified immunity is justified? Correct. Correct. I mean, it wouldn't necessarily mandate the case going to trial. What it would require is the district court take a look at the summary judgment... with the video as part of it... Correct. ...before deciding that question... Correct. ...of the triability of it. Correct. Your Honor, we've argued in our briefs that Mr. Dulworth is entitled to a trial just on these facts alone. But should this court... It may be. I don't know. Just a couple quick rebuttal points. As to the de minimis argument, Mr. Dulworth would submit that the defendants have waived the argument. And in any event, that's not the line that the Supreme Court drew in Bell. The Supreme Court did not charge courts with trying to determine what types of punishments are de minimis and what are not. The court drew the line between regulatory measures and punitive measures. So what areas of discretion would you acknowledge prison officials must... in order to discharge their responsibilities with respect to the management of the facility? Just enumerate the discretionary areas that are important in your judgment for management of a jail that preserves a semblance of order. I would just point, Your Honor, to some of those outlined by federal courts and the Supreme Court already. We've mentioned the emergency restraint measure. The court in Wolfe actually outlines a number of discretionary factors that jail officials have, including the right to limit the number of witnesses called. Including what? Sorry? Including what did you just say? Including the right of officials to limit the number of witnesses that a detainee may call, to limit access to other inmates, to limit access to officers who, if the inmate were able to call the officer, it might undermine authority. These are at the hearing. These are at the hearing. Correct. And obviously the court denied the inmate the right to cross-examine witnesses. But we can see that all of these hearings need not be pre-deprivation. Correct. We agree that temporary emergency measures can be taken. But again, before... Yeah. And then you can have a post-deprivation hearing. Correct. Correct. But we would just submit that that's not this case, because... I guess it depends on what you regard as the deprivation. If the initial emergency detention is not a deprivation, but an emergency...  Before you engage in punishment for misbehavior... Correct. Every trial detainee, you've got to give them a hearing. Correct. Exactly. Maybe pulling two inmates apart and separating them while charges are... Somebody has to fall off for 24 hours. What about the situation brought up by opposing counsel, which is, there may be, and a lot of jails operate in this way, there may be a number of privileges, such as visiting the canteen, or what hours you can watch television in the common room, or what hours you can play pool, or what have you. Would you acknowledge that there can be some restrictions on those sorts of privileges, which would nonetheless fall short of a penal act or punishment? In other words, those sort of minor privileges can be an important management tool, and they're not really punitive in the sense that solitary is punitive, you know, never being out of your cell or what have you, but the jail's still permitted to have those sorts of privileges. There's some area that, I don't like the word de minimis, but some area that falls short of being a penal sanction. Your Honor, we would just submit that that's not this case. The Supreme Court obviously didn't address that in Bell or Wolf. It's a very common tool of management in all detention facilities. I would think that if the prison could make an adequate showing that it was a regulatory measure and not a punitive measure, then they could satisfy the Bell test, and perhaps a system, say, of verbal warnings to detainees would certainly be considered a regulatory policy. We're going to remove your privileges of going to the pool hall. That's not punitive, really, is it? I mean, we would have to argue, Your Honor, that there's no conceivable purpose other than a punitive one of such a measure like that, unless it was for something like being unruly or disruptive, and there was a specific protective purpose to imposing that penalty. But again, that's not this case. In this case, there's just no question that solitary confinement is historically considered a punishment in this country. Just a couple other quick notes that if Your Honor would like to refer to JA 87 and JA 93. Those are the grievances in which Mr. Dilworth specifically requests a hearing and identifies the relevant individuals involved. Were the names of any witnesses mentioned? Yes, the officers. The officers who were there were mentioned by name. All right. Your time is up. Do you have any brief concluding statements you want to make? Yes, Your Honor. Just that, you know, in light of the fact that defendants have conceded that the procedures were not followed here on the procedural due process claim, we would ask that the court direct a judgment for Mr. Dilworth from the district court and order trial and damages on that issue. And we would ask that for the excessive force claim, a trial be awarded on that as well. And if not, that the court should direct the district court to make that video a part of the record in its reconsideration. All right. Thank you so much. And I think that you're court appointed, and we very much appreciate your accepting that representation. We'll come by and come down and greet counsel, and then we'll take a brief recess.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Pamela A. Harris